# Exhibit A

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 2 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

Plaintiffs - Appellees,

v.

DOJ - UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, Attorney General, in his official capacity as Attorney General; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,

Defendants - Appellants.

No. 26-7303

D.C. No.
3:26-cv-12800-TLT
Northern District of California,
San Francisco

ORDER

Before: Mary H. Murguia, Chief Judge, and Consuelo M. Callahan and Carlos T. Bea, Circuit Judges.

BEA, Circuit Judge:
Dissent by Chief Judge MURGUIA

Pursuant to Circuit Rule 27-3, Defendants-Appellants ("the Government") has moved for an immediate administrative stay and a stay pending appeal of the district court's grant of a temporary restraining order in favor of Plaintiffs-Appellees. We

have jurisdiction over this case under 28 U.S.C. § 1292(a)(1). The Government's motion is **GRANTED**.[†]

## I.

On October 29, 2026, Plaintiffs—two labor unions, and two political-interest groups—sued Defendants—the United States Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), the Attorney General, and the Secretary of Homeland Security (collectively, "the Government"). **D. Ct. Dkt. 26 ("Order") at 1.** Plaintiffs alleged, in relevant part, that Defendants violated the Voting Rights Act ("VRA") and the United States Constitution's Elections Clause when federal officers sent and delivered letters to California and Washington that requested that state and county election officials "sequester" the ballots of certain voters the Government believed to be aliens, **Order at 3; D. Ct. Dkt. 19-7 at 127–28.** The letters also stated that "[a]n alien voting in a federal election is a federal crime—and knowingly facilitating such conduct is equally unlawful." **D. Ct. Dkt. 29-1 at 9.** *Infra* App'x.

Plaintiffs filed an *ex parte* motion for a temporary restraining order ("TRO") to enjoin the Government from making any further requests for ballot sequestration or "threats" of prosecution. **D. Ct. Dkt. 17.**

The district court granted the motion on October 30, 2026. By its terms, the TRO will expire on November 16, 2026, seventeen days after its entry.[‡] **Order at 7.** It bars the Government from making further ballot-sequestration requests and "threats" of prosecution. ***Id.* at 6–7.** It also requires the Government to inform any state, county, or local government "to which any Defendant sent a letter regarding the processing and counting of ballots in the 2026 election . . . that the demands and threats of prosecution . . . reflected in that letter have been enjoined," and requires the DOJ to "inform the Court of any pending search warrant applications, grand jury

---

[†] Plaintiffs-Appellees' motion to file an oversize brief and *amicus curiae* Justice Connection's motion to file an amicus brief are likewise **GRANTED.**

[‡] We note that the district court attempted to modify the TRO to last only fourteen days during a hearing on November 2, 2026. However, after the Government's appeal, the district court lacked the jurisdiction to do so. *E.g.*, *Davis v. United States*, 667 F.2d 822, 824 (9th Cir. 1982) ("The filing of a notice of appeal generally divests the district court of jurisdiction over the matters appealed.") Therefore, we review the terms of the TRO as they existed at the time of the Government's appeal.

subpoenas . . . pertaining to any list of individuals alleged by Defendants to be ineligible to vote." **Order at 7.**

The district court entered the TRO *ex parte*. As it was not a hearing upon notice, the Government did not appear to oppose Plaintiffs' motion in the district court.

The Government filed a notice of appeal and, on November 1, 2026, filed the instant motion.

**II.**

We review the Government's motion for a stay pending appeal under four factors: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). A stay "is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 433 (citation omitted). It is "an exercise of judicial discretion," and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

The first two factors "are the most critical." *Id.* at 434. On the first, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* (citation omitted). On the second, "simply showing some 'possibility of irreparable injury'" does not suffice. *Id.* at 434–35 (citation omitted); *see Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020); *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011) (per curiam). Once an applicant satisfies the first two factors, we assess the harm to the opposing party and weigh the public interest. *Nken*, 556 U.S. at 435. Those factors merge when the government is a party. *See id.*; *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

In evaluating the Government's likelihood of success, we "review an order regarding preliminary injunctive relief for abuse of discretion, but review any underlying issues of law de novo." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (citation omitted).

**III.**

The Government has established a likelihood of success on the merits.

**A.**

First, we clarify that the district court's order, though styled as a TRO, is reviewable as a preliminary injunction. Whether a court of appeals has jurisdiction to review an order styled in this manner depends on the "practical effect" of the order, not the order's title. *Abbott v. Perez*, 585 U.S. 579, 594 (2018) ("We have previously made clear that where an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction); *Sampson v. Murray*, 415 U.S. 61, 86 n.58, 88 (1974) (construing a TRO as a preliminary injunction based on, in relevant part, "the possibility of drastic consequences which cannot later be corrected. . . . To deny review of an order that has all the potential danger of a preliminary injunction in terms of duration, because it is issued without a preliminary adjudication of the basic rights involved, would completely defeat the purpose [of appellate review of preliminary injunctions].")

A TRO has the effect of a preliminary injunction (and is therefore reviewable by the court of appeals) when it lasts longer than the default TRO period of fourteen days, *id.* at 1043–44, when it requires mandatory action, *Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978), or when, absent review, the appellant "would be effectively foreclosed from pursuing further interlocutory relief," *Newsom v. Trump*, 141 F.4th 1032, 1044 (9th Cir. 2025) (per curiam) (quoting *Env't Def. Fund, Inc. v. Andrus*, 625 F.2d 861, 862 (9th Cir. 1980)).

The TRO here has all three features. It lasts an initial period of seventeen days, it requires mandatory action by the Government (notifying every recipient of the letters and disclosing pending subpoenas and warrant applications), and it bars the Government from demanding ballot sequestration until and beyond Election Day, which renders later interlocutory relief meaningless for the Government's purposes. Therefore, we have jurisdiction to review it.

**B.**

Next, we review the substance of the district court's order. The district court's order is based on its conclusion that Plaintiffs had established that the Government's conduct likely violated Section 11(b) of the VRA and the Elections Clause.

The district court is likely wrong on both counts.

Section 11(b) of the VRA, 52 U.S.C. § 10307(b), provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of title 42.

Plaintiffs' VRA claim faces an immediate problem: Section 11(b) does not contain an express private cause of action. *See* 52 U.S.C. § 10307(b). Instead, the VRA's text vests enforcement authority in the Attorney General. *Id.* § 10308(d) ("Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section . . . 10307 . . . , the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief . . . ."). "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

The more fundamental problem is that Plaintiffs' claim would require us to recognize an implied private cause of action *against the Executive*. *Cf. Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) ("it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation."). The VRA's text, which prohibits conduct by "person[s]," counsels against such a reading, as courts apply a "longstanding interpretive presumption that 'person' does not include the sovereign," *Return Mail*, 587 U.S. at 626–27, and require "an express statement by Congress" before subjecting the Executive to a generally applicable statute. *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992).

This separation-of-powers concern has particular weight in this case. Consider the conduct at issue here: the Government delivered letters to state and local officials that requested that the states implement the Executive's preferred policy, warned those states of the strictures of federal law, and instigated investigations into suspected violations of that law. These are core Executive functions. Congress cannot be lightly presumed to have imposed new liability for that conduct. *See Trump v. United States*, 603 U.S. 593, 609 (2024) ("Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and

preclusive' constitutional authority."); *id.* at 620 ("the Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime," and "[i]nvestigative and prosecutorial decisionmaking is 'the special province of the Executive Branch.'"); *id.* at 627 (explaining that the Take Care duty "plainly encompasses enforcement of federal election laws," and the Executive "may speak on and discuss such matters with state officials . . . to encourage them to act in a manner that promotes the President's view of the public good."); *cf. Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead.").

We therefore decline Plaintiffs' invitation to read the VRA as rendering the Executive's exercise of those functions as unlawfully intimidating, threatening, or coercive.

The Government is also likely to prevail on Plaintiffs' Elections Clause claim. The Elections Clause assigns to the states the authority "to prescribe the manner by which congressional elections are conducted." *United States v. California,* ___ F. 4th ____, 2026 WL 3268272, at *3 (9th Cir. Oct. 30, 2026). In this case, the Government requested that the targeted states sequester certain ballots. They refused, and that refusal was ratified by this Court, *see generally id.*, and the Supreme Court declined to grant emergency relief, *United States v. California*, 610 U.S. __ (Nov. 2, 2026). The states' constitutional authority to regulate their elections is therefore unaffected. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (holding that the federal government may request, but not compel, the states to enact or enforce a federal program).

Plaintiffs treat *California* as dispositive on this point. The present case, however, poses a different question from that posed to the *California* panel: there, the panel decided whether a state *must* adopt the ballot-sequestration process requested by the Government here. *California*, ___ F. 4th ____, 2026 WL 3268272, at *1. Here, we consider only whether the Government *can* make such a request in the first place. And as we explained above, we think that the Government has established that it likely can. We find these requests to be core Executive functions that did not actually disturb the states' regulation of their own elections.

### C.

The remainder of the factors do not counsel against a stay. Absent a stay, the Government will be irreparably injured. *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025) (mem.) (Kavanaugh, J., concurring in the grant of application for stay) ("As the Court has indicated, any time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (cleaned up) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025)).[§]

At most, Plaintiffs fear a possibility of a future prosecution. If such a prosecution is ever brought, the prosecution itself supplies the means by which any defect, vindictiveness included, can be raised and remedied. *See Sampson*, 415 U.S. at 90 (citation omitted) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). The Government's injury—being barred from requesting that the states segregate ballots from suspected non-citizens—cannot be undone after the fact.

## IV.

For these reasons, we **GRANT** the Government's motion for stay.

[§] This case is distinguishable from *California Nurses Ass'n v. Mullin*, No. 26-7139, ___ F.4th ___, 2026 WL 3268397 (9th Cir. Oct. 30, 2026) (per curiam). There, we held that the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Cal. Nurses*, 2026 WL 3268397, at *6 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). As we explained above, the conduct by the Government here was likely not unlawful.

FILED

NOV 2 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Service Employees International Union v. Department of Justice*, No. 26-7303
MURGUIA, Chief Judge, dissenting:

Last Friday, we held that the United States has no authority to compel state elections officials to disregard their own lawful election procedures. *United States v. California*, No. 26-7231, 2026 WL 3268272, at *4 (9th Cir. Oct. 30, 2026) (hereinafter, "*California*"). Today, by contrast, we hold that several federal agencies and officials ("Defendants") *may* compel state election officials to put aside state election procedures in favor of Defendants' preferred procedures by threatening prosecution of state and local election officials who fail to comply. These two decisions cannot be reconciled. I dissent.

**I.**

On October 13, 2026, Defendant Department of Justice ("DOJ") sent letters to the State of California and Los Angeles County demanding that election officials review a list of approximately 20,000 registered California voters who federal agencies identified as "likely noncitizens" *within 48 hours*. California and Los Angeles County refused, expressing doubts about the veracity and reliability of the list.

The United States sued California and Los Angeles County on October 15. *United States v. California*, No. 2:26-cv-12025-DOC-ADS (C.D. Cal.). On October 16, the DOJ sent a letter to Los Angeles County officials stating:

> Under 18 U.S.C. § 611(a), noncitizens are prohibited from voting in

> any election involving federal offices. Under 18 USC. § 2, anyone who aids, abets, counsels, induces, or procures the commission of a federal offense is equally liable. **If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime.** Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not relieve election officials of their obligations under federal law *when they are on actual notice of noncitizen voting.*

(Emphases added.)

While the case was pending, the DOJ delivered letters—using uniformed DHS officers—to county officials across California, providing lists of purported noncitizens on the voter rolls and reiterating that the letters placed recipients on notice that they risk criminal liability if they process or count ballots that Defendants claims are ineligible. Federal marshals reportedly served at least one county employee at home.

At the October 27 district court hearing in *California*, Defendants again reiterated "that State and County election officials who do not comply with [Defendants'] letter risk federal charges under 18 U.S.C. § 2, which criminalizes aiding and abetting the commission of a criminal offense." *United States v. California*, No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428, at *7 (C.D. Cal. Oct. 28, 2026). The district court in *California* denied the United States' request for an injunction on the following day, October 28.

By October 29, the DOJ reportedly directed federal prosecutors to pursue

criminal subpoenas of state and local elections officials in California. Defendants reportedly sent similar letters to election officials in all fifty states.

On October 30, this court denied the United States' emergency motion for an injunction on appeal in *United States v. California*, concluding that the United States had not shown a likelihood of success on its claim that 18 U.S.C. § 611 preempts California's constitutionally permitted statutory scheme for administering its elections. *California*, 2026 WL 3268272, at *4. Today, the Supreme Court denied, without dissent, Defendants' application for an injunction pending appeal. *United States v. California*, No. 26A624 (U.S. Nov. 2, 2026).

Plaintiffs Service Employees International Union, AFL-CIO and American Federation of State County and Municipal Employees, AFL-CIO represent thousands of election workers in California and across the country, who face the risk of criminal prosecution for complying with state election procedures. Plaintiffs National Association for the Advancement of Colored People and the League of United Latin American Citizens represent members who fear that Defendants will erroneously identify them as noncitizens and that the resultant disruption will prevent their votes from being counted.

On October 30, the district court—without opposition from Defendants and without a hearing—granted Plaintiffs' ex parte application for a temporary restraining order ("TRO") enjoining Defendants from "threaten[ing], intimidat[ing]

or coerc[ing] state or local elections officials or workers" for failure to comply with Defendants' demands to halt processing of ballots cast by individuals that Defendants allege are ineligible to vote.

**II.**

In deciding whether to grant a stay, we consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1139 (9th Cir. 2025) (citation modified) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434.

**III.**[1]

In *California*, this court addressed whether the United States may, relying on 18 U.S.C. § 611, require states to segregate ballots from individuals that federal

[1] As an initial matter, it is not clear that the district court's order is appealable, as, in face of exigent circumstances, the district court issued the TRO without a hearing or any challenge to the basis of its order. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) ("We treat a TRO as a preliminary injunction 'where an adversary hearing has been held, and the court's basis for issuing the order [is] strongly challenged.'" (quoting *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002)).

agencies have identified as "likely" noncitizens. *California*, 2026 WL 3268272 at *3. We concluded it may not. Now, Defendants ask us to consider whether they may compel state and local officials to comply with their preferred procedure on pain of prosecution. The answer is the same: they may not.

*California* is binding on this panel, and it is all but dispositive here.

There, we explained that the Elections Clause expressly vests the states with "responsibility for the mechanics of congressional elections," unless Congress preempts state elections procedures. *Id.* (quoting *Arizona v. Inter-Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) ("*ICTA*")). And "[n]othing in § 611, a statute that criminalizes voting by a noncitizen, preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause." *Id.* at *4. California law, like federal law, "plainly prohibits voting by noncitizens," and "[t]o that end, California has established a comprehensive statutory scheme to ensure the integrity of its elections." *Id.* "Because Congress has not exercised the specific power granted to it under the Elections Clause to override California's established laws for challenging ballots or removing ineligible voters," permitting the United States "to prescribe how [California] must process ballots would 'override the plain and manifest dictates of the Constitution itself.'" *Id.* at *5 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1879)).

As in *California*, Defendants rely on 18 U.S.C. § 611.[2] And as in *California*, Defendants seek to compel state and local elections officials to segregate the contested ballots. The majority characterizes Defendants' demand as a mere "request." But if Defendants lack the authority to *directly* compel state election officials to implement their preferred state elections procedures, it is difficult to imagine how Defendants may *indirectly* coerce state election officials to disregard state eligibility procedures through threat of prosecution. *See Coal. for Humane Immigr. Rts v. Dep't of Homeland Sec.*, No. 26-cv-3072, at *15 (D.D.C. Cir. Nov. 2, 2026) ("It is thus highly doubtful that Section 611(a) could be constitutionally applied to criminalize state officials' compliance with state-law procedures for counting ballots cast by registered voters."). The majority would permit Defendants to preempt state election procedures by threat of prosecution.

Accordingly, Defendants are not likely to succeed on the merits of Plaintiffs' Election Clause claim.

**IV.**

[2] Defendants' attempt to buttress their authority through the Take Care Clause must fail, as the Take Care Clause cannot confer on Defendants powers that Congress has not. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"); *California*, 2026 WL 3268272, at *4 ("Congress's exercise of its Elections Clause preemption power only goes 'so far as it is exercised, and no farther.'" (quoting *ICTA*, 570 U.S. at 9))

For similar reasons, Defendants cannot establish irreparable harm. "*Nken* instruct[s] 'that if the petition[er] has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (citation omitted). "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008). But as explained below, Defendants are not harmed by state and local officials' compliance with lawful elections procedures, and the TRO does not irreparably curtail Defendants' exercise of their prosecutorial powers.

In their filings, Defendants vacillate between two theories of irreparable harm. On one hand, Defendants contend that it is imperative that they continue to issue these "warn[ings]" to state and local elections officials lest elections officials refuse to segregate the contested ballots. That is, Defendants contend that they would be harmed if elections officials follow the very state elections procedures that we have determined are *lawful*. *California*, 2026 WL 3268272, at *4. In the absence of an underlying "crime," the inability to prosecute that crime cannot rise to the level of irreparable harm under *Nken*.

That the district court in *California* found Defendants' process for creating their list was not credible "substantially weaken[s] [Defendants'] claim that they

are likely to suffer irreparable harm from" election officials tabulating "ballots being cast by noncitizens." *Id.* at *6. Indeed, Defendants' efforts are far more likely to disenfranchise eligible voters than they are to prevent noncitizen voting, hindering Defendants' important interest in ensuring that the votes of eligible voters are counted.

On the other hand, Defendants argue that any encroachment on their prosecutorial authority constitutes irreparable harm. As an initial matter, the TRO does *not* preclude lawful investigations or prosecutions of voter fraud—even into elections officials. It only bars demands or threats of prosecution against election officials for processing ballots from individuals who Defendants allege are ineligible to vote for a two-week period during the administration of an ongoing election. Defendants "do not point to evidence explaining that" their enforcement activities "would be impracticable or impossible to conduct under the [TRO's] constraints." *California Nurses Ass'n v. Mullin*, No. 26-7139, 2026 WL 3268397, at *6 (9th Cir. Oct. 30, 2026).

Moreover, Defendants' window to prosecute and investigate voter fraud does not end on Election Day. The "federal government can still prosecute noncitizens for voting after the fact because the State preserves the records of who voted (even if the State allows the noncitizen vote to count)." *United States v. California*, No. 26-7070, 2026 WL 3212945, at *24 (9th Cir. Oct. 26, 2026)

(Bumatay, J., dissenting). Indeed, the DOJ's longstanding policy directs that it should not engage in "overt criminal investigative measures . . . involving alleged ballot fraud" until the election is concluded. Justice Manual §9-85.300. *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (concluding that a stay was not necessary to avoid irreparable harm where the district court's order "merely returned the nation temporarily to the position it has occupied for many previous years").

Finally, the principles underlying *Purcell* counsel against disturbing the district court's order while the election is ongoing. The district court's TRO effectively preserves state eligibility procedures during an ongoing election, consistent with the principle that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Scanlan v. Coal. for Open Democracy*, 610 U.S. ___, 2026 WL 3167846, at *1 (2026) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)). "The *Purcell* principle applies with even greater force" when, as here, an election is already under way. *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026) (per curiam); *see California*, 2026 WL 3268272 at *7 ("[I]t is not only voter confusion that matters in the *Purcell* analysis but election administration and broader electoral disorder stemming from late federal court-ordered changes to election rules." (citation omitted)). Defendants'

efforts to investigate and prosecute elections officials would hamper states' ability to effectively administer an election that is already well under way.

Defendants have not shown irreparable harm.

**V.**

On the eve of Election Day, Defendants insist they must be free to use their prosecutorial powers to do what they could not through their applications for injunctions in this court and the Supreme Court. But the federal executive has no right to dictate election procedures to the states. And if Defendants cannot dictate these procedures directly, then they likewise cannot dictate them by subjecting vulnerable election workers to baseless—but chilling—threats of federal prosecution. The Constitution's allocation of election procedures to the states is meaningless if Defendants can coerce states into foregoing their chosen procedures by abusing their prosecutorial powers.

I would deny Defendants' emergency motion to stay because the district court properly attempted to put a stop to Defendants' efforts to intimidate election workers into abandoning lawful state election procedures through spurious threats of prosecution. I respectfully dissent.

# APPENDIX

**U.S. Department of Justice**

950 Pennsylvania Ave, NW
Washington, DC 20530

(202) 514-2000

October 13, 2026

Dean C. Logan
Los Angeles County Registrar-Recorder / County Clerk
12400 Imperial Highway
Norwalk, CA 90650

Via hand delivery

Re: Noncitizen Voting in the 2026 Federal Election

Dear Mr. Logan:

As you're aware, federal law prohibits noncitizens from voting in federal elections. *See* 18 U.S.C. § 611. The Supreme Court has also recognized that States "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citation omitted). I write to seek your help to protect the integrity of the ongoing federal election.

On July 16, Secretary Mullin made the California Secretary of State aware that there are likely numerous noncitizens registered to vote in the federal election in California. He then asked for her cooperation to ensure the accuracy of these findings and to prevent noncitizen votes from diluting citizen votes. The Secretary's response the following week did not refute that noncitizens are registered to vote in California. Nor did it contest that noncitizens receive ballots through California's vote-by-mail regime, which automatically sends voting materials to "every registered voter." 2021 Cal. Stat. ch. 312 (codified at Cal. Elec. Code § 3000.5). Instead, the Secretary of State asked for more information. I am now providing you, along with the Secretary of State, additional details.

Accompanying this letter is a password-protected thumb drive with a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot from California to participate in the November 2026 federal election.

We request that you review the list within 48 hours to determine whether any citizens are listed. For individuals whom you cannot independently confirm citizenship status, we request that you immediately instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined. If individuals on the list have not yet been sent

2026 OCT 13 PM 2: 55

a vote-by-mail ballot, take all immediate and reasonable steps to not provide a ballot to those individuals until we confirm their citizenship status. If a ballot for any individual on the list has been returned, instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined. This process will protect American citizens' votes while preventing noncitizens from participating in the federal election in violation of federal law.

The United States hopes that you share our commitment to ensure that only American citizens participate in our federal elections. Allowing noncitizens to vote cancels citizen votes. States are responsible for voter registration, and the Federal Government is responsible for maintaining immigration records to enable verification of citizenship. Working together, we can more effectively protect against voter dilution and promote election integrity.

Please ensure that the process described above to prevent noncitizens from voting in the federal election is implemented by contacting election@hq.dhs.gov by October 15 at noon EST. If you cannot implement this process by then, given the ongoing federal election, the United States will have no choice but to seek emergency relief.

We look forward to our collaboration as we work together to ensure free, fair and accurate elections.

Sincerely,

R. Trent McCotter
Acting Deputy Attorney General
United States Department of Justice

cc:

Bilal A. Essayli
First Assistant U.S. Attorney
Central District of California

PASSWORD: [redacted]

**U. S. Department of Justice**

*United States Attorney*
*Eastern District of Washington*
*Thomas S. Foley U. S. Courthouse, Suite 340*
*P. O. Box 1494* *(509) 353-2767*
*Spokane, Washington 99210-1494* *Fax (509) 835-6397*

October 26, 2026

Via Email

The Honorable Steve Hobbs
Secretary of State
PO Box 40220 Olympia, WA 98504-0220
steve.hobbs@sos.wa.gov;
secretaryofstate@sos.wa.gov

Re: Noncitizen Voting in the 2026 Federal Election

Dear Secretary Hobbs,

As you're aware, federal law prohibits noncitizens from voting in federal elections. *See* 18 U.S.C. § 611. The Supreme Court has also recognized that States "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison,* 413 U.S. 455, 465 (1973) (citation omitted). We're aware of the current litigation and correspondence surrounding Assistant Attorney General Harmeet Dhillon's request for the Washington voter roles – our request here, is separate and apart from that inquiry and litigation, as we seek your assistance to protect the integrity of the ongoing federal election.

Washington law requires the automatic mailing of voting materials to "each active registered voter of the state." Revised Code of Washington §29A.40.010. By law, ballots are to be mailed to "each voter at least eighteen days before each primary or election," and ballots for the 2026 General Election were required to be sent to voters no later than October 15, 2026. Revised Code of Washington §29A.40.070(1). Accordingly, any registered voter in the State of Washington, including noncitizens that receive ballots through Washington's vote-by-mail regime, was required to be sent a ballot no less than seven (7) days ago.

The United States is concerned with the number of noncitizen voters, both enrolled and actively voting in the State of Washington, as allowing noncitizens to vote cancels citizen votes. To combat voting by noncitizens, in violation of 18 U.S.C. § 611, the Department of Homeland Security (DHS) provided our offices a list of names of persons who are noncitizens, who, with a high level of confidence, have voted in elections as recently as the August 2026 Primary elections. Some of these individuals have voted in Washington for over a decade and have voted more than two dozen times. To be clear: through the efforts of our federal law enforcement partners, the individuals identified are or were noncitizens (i.e., they may have subsequently naturalized). Our federal partners further identified that these individuals have, with a high level of confidence, voted. It is the United States' belief that each of these individuals was sent a vote-by-mail ballot from the State of Washington to participate in the November 2026 federal election. The list of the identified individuals is attached to this letter and is comprised of over 400 individuals and over 1,500 total votes.

We advise that we anticipate imminently receiving a second list of individuals believed to be noncitizens who are registered to vote from DHS, which we will transmit ahead of the November 2, 2026, General Election with the request that you follow the protocol listed below.

To help protect the integrity of the 2026 Election our request and expectations are simple:

1. You, or your office, review the list within 24 hours of receipt of this letter to determine whether United States citizens are listed.
2. If a ballot for any individual on the list has been or subsequently is returned, instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined.

We believe the requested actions will allow your office to determine whether noncitizens are voting in Washington's elections in violation of State and Federal law. As you noted in your July 7, 2026, letter to William Mohrman, Senior Counsel with the Department of Justice's Civil Rights Division, RCW 29A.04.205 provides the State's obligation and commitment "to protect the integrity of the electoral process." You further invited the Department of Justice to provide "meaningful assistance" to protect election integrity – that is our goal here. Through these efforts, specific individuals were identified, who, with high confidence, should not be registered to vote under Washington law, RCW 29A.08.370. Our request is simple; we ask that your office rectify this issue immediately. We further recognize the obligation county auditors and government agency employees providing voter registration services are under to properly carry out their duties in connection with voter registration pursuant to RCW 29A.84.110. While our offices do not enforce State law, we do make criminal referrals to our state counterparts; nonetheless, we do expect a prompt response from your office by enacting the approach above and with any further actions you deem appropriate to comply with the State or Federal laws cited.

Please ensure that the process described above to prevent noncitizens from voting in the federal election is implemented by contacting election@hq.dhs.gov and copying me at: pete.serrano@usdoj.gov by October 28 at noon PST. If you cannot implement this process by then, given the ongoing federal election, the United States will have no choice but to seek emergency relief.

The United States hopes that you share our commitment to ensure that only American citizens participate in our federal elections. Your assistance in this process will protect American citizens' votes while preventing noncitizens from violating federal law by participating in the federal election. We look forward to our collaboration as we work together to ensure free, fair and accurate elections.

Sincerely,

Charles Neil Floyd
Acting United States Attorney

Pete Serrano
First Assistant United States Attorney

cc: Stuart Holmes
Director of Elections
416 Sid Snyder Ave SW
Olympia, WA 98501
stuart.holmes@sos.wa.gov

**U.S. Department of Justice**

950 Pennsylvania Ave, NW
(202) 514-2000
Washington, DC 20530

October 13, 2026

Shirley N. Weber, Ph.D.
California Secretary of State
1500 11th Street
Sacramento, CA 95814

Via legalsupport@sos.ca.gov

Re: Noncitizen Voting in the 2026 Federal Election

Dear Secretary Weber:

As you are aware, federal law prohibits noncitizens from voting in federal elections. *See* 18 U.S.C. § 611. The Supreme Court has also recognized that States "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citation omitted). I write to seek your help to protect the integrity of the ongoing federal election.

On July 16, Secretary Mullin made you aware that there are likely numerous noncitizens registered to vote in the federal election in California. He then asked for your cooperation to ensure the accuracy of those findings and to prevent noncitizen votes from diluting citizen votes. Your response the following week did not refute that noncitizens are registered to vote in California. Nor did it contest that noncitizens receive ballots through California's vote-by-mail regime, which automatically sends voting materials to "every registered voter." 2021 Cal. Stat. ch. 312 (codified at Cal. Elec. Code § 3000.5). Instead, you asked for more information. I am now providing you additional details.

Earlier today, we provided the Los Angeles County Registrar-Recorder / County Clerk with a password-protected thumb drive with a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election. We can also provide you a digital copy of the list if you send us a secure email address.

We request that you review the list within 48 hours to determine whether any citizens are listed. For individuals whom you cannot independently confirm citizenship status, we request that you immediately instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined. If individuals on the list have not yet been sent a

vote-by-mail ballot, take all immediate and reasonable steps to not provide a ballot to those individuals until we confirm their citizenship status. If a ballot for any individual on the list has been returned, instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined. This process will protect American citizens' votes while preventing noncitizens from participating in the federal election in violation of federal law.

The United States hopes that you share our commitment to ensure that only American citizens participate in our federal elections. Allowing noncitizens to vote cancels citizen votes. States are responsible for voter registration, and the Federal Government is responsible for maintaining immigration records to enable verification of citizenship. Working together, we can more effectively protect against voter dilution and promote election integrity.

Please ensure that the process described above to prevent noncitizens from voting in the federal election is implemented by contacting election@hq.dhs.gov by October 15 at noon EST. If you cannot implement this process by then, given the ongoing federal election, the United States will have no choice but to seek emergency relief.

We look forward to our collaboration as we work together to ensure free, fair and accurate elections.

Sincerely,

R. Trent McCotter
Acting Deputy Attorney General
United States Department of Justice

cc:

Bilal A. Essayli
First Assistant U.S. Attorney
Central District of California

**U.S. Department of Justice**

950 Pennsylvania Ave, NW
Washington, DC 20530

(202) 514-2000

October 16, 2026

Peter M. Bollinger
Assistant County Counsel
Los Angeles County Counsel's Office

Re: Response to October 15, 2026 Letter

Mr. Bollinger:

The Department of Justice has reviewed your October 15 letter responding to the federal investigative materials provided to the Los Angeles County Registrar-Recorder/County Clerk ("County ROV"). I write to address several legally untenable assertions and to make unmistakably clear the legal implications for violating 18 U.S.C. § 611.

Your letter asserts that the County ROV is "legally prohibited" from taking even minimal steps—such as temporarily segregating ballots—after receiving credible federal evidence identifying tens of thousands of individuals suspected to be noncitizens. That position is incorrect as a matter of federal law and places officials in both the California Secretary of State ("SOS") and County ROV offices at risk of knowingly facilitating violations of federal criminal statutes.

On October 13, the Department hand delivered a password-protected dataset identifying more than 20,000 individuals who federal agencies reasonably believe are likely noncitizens registered to vote in California. This list was developed through a multilayered, multiagency investigative methodology that relied upon internal immigration records, data matching, supervisory verification procedures, and more.

The legal consequences for either facilitating or ignoring a federal crime are significant. Noncitizen voting in a federal election is a federal crime—and knowingly facilitating such conduct is equally unlawful. Under 18 U.S.C. § 611(a), noncitizens are prohibited from voting in any election involving federal offices. Under 18 U.S.C. § 2, anyone who aids, abets, counsels, induces, or procures the commission of a federal offense is equally liable. If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime. Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not relieve election officials of their obligations under federal law ***when they are on actual notice of noncitizen voting.*** Nor can state procedures supersede federal criminal statutes.

Your argument that the County is "not authorized" to pause or segregate ballots because California relies on attestation-based registration is immaterial. Section 611 does not excuse unlawful voting simply because a State employs a permissive registration method. The Department has not asked the County to adjudicate immigration status; it has asked the County to temporarily set aside ballots from individuals whose eligibility is credibly in question—a standard election-administration practice implemented nationwide.

Likewise, your reliance on the National Voter Registration Act's ("NVRA's") "quiet period" is misplaced. The NVRA's 90-day limitation applies only to systematic list-maintenance programs—not to targeted, individualized evidence of unlawful voting identified by federal law enforcement. The Department has not requested a purge, cancellation of registrations, or any programmatic action. We requested only temporary ballot segregation pending citizenship verification. Invoking the NVRA to justify counting ballots unlawfully cast is both legally incorrect and operationally irresponsible.

Additionally, the administrative burdens, timing constraints, or the fact that the investigative list includes individuals residing outside Los Angeles County do not permit the County to knowingly tabulate ballots that federal law prohibits. Once the United States provides credible evidence that certain ballots may be unlawful to count, election officials may not disregard that information because it is inconvenient to process. Administrative difficulty is not a defense to violating federal law or aiding or abetting a federal offense.

The Department strongly urges the County and the SOS to reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure.

Sincerely,

/s/____________________
Trent McCotter
Acting Deputy Attorney General
United States Department of Justice

cc: Shirley N. Weber, Ph.D, California Secretary of State
Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk

*United States Attorney*
*Northern District of California*

*11th Floor, Federal Building*
*450 Golden Gate Ave., Box 36055*
*San Francisco, CA 94102-3495*

*(415)436-7200*

*FAX: (415)436-7234*

October 23, 2026

Matt Moreles
Registrar of Voters
Santa Clara County
1555 Berger Drive, Building 2
San Jose, CA 95112

Re: Notice of Suspected Likely Aliens on the Santa Clara County Voter Roll

Dear Mr. Moreles:

As you're aware, federal law prohibits noncitizens from voting in federal elections. *See* 18 U.S.C. § 611. It is also unlawful to deprive the residents of California of a fair and impartially conducted federal election process by casting or tabulating ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of California. *See* 52 U.S.C. 20511(2)(B). And it is unlawful for those not entitled to vote in an election to fraudulently vote or attempt to vote. *See* Cal. Elec. Code § 18560(a). The Supreme Court has also recognized that States "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citation omitted). I write to seek your help to protect the integrity of the ongoing federal election.

On July 16, the Secretary of the Department of Homeland Security (DHS) made the California Secretary of State aware that there are likely numerous noncitizens registered to vote in the federal election in California. He then asked for her cooperation to ensure the accuracy of these findings and to prevent noncitizen votes from diluting citizen votes. The Secretary's response the following week did not refute that noncitizens are registered to vote in California. Nor did it contest that noncitizens receive ballots through California's vote-by-mail regime, which automatically sends voting materials to "every registered voter." 2021 Cal. Stat. ch. 312 (codified at Cal. Elec. Code § 3000.5). Instead, the Secretary of State asked for more information. The Department of Justice provided those details to the Secretary on October 13, which included a list of more than 20,000 names with accompanying personal identifying information for suspected aliens who are registered to vote in California. I am now providing you with a subset of that list specific to Santa Clara County that contains 902 likely aliens. Earlier this week, the Department charged 28 aliens for unlawful voting and registration offenses, each

of whom was on the list provided to the California Secretary of State.[1]

Within 48 hours, we ask that you commit to working with DOJ and DHS to identify who on the accompanying list is a citizen and who is not. That means sending us the nonpublic information associated with each suspected alien's registration, which includes everything in your possession from the following: a social security number, a copy of a state ID or driver's license or the information that appears on it, a copy of the voter registration application supporting the registration, and a copy or list of documents that were presented by the registrant at the time the person registered to vote or obtained their driver's license if registered as part of motor voter. By comparing the accompanying list with the requested information you provide, together we can quickly assess these specific suspected aliens registered to vote in your County.

For individuals whom citizenship status cannot be confirmed, we request that you immediately instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined. If a ballot for any individual on the list has been returned, instruct the appropriate elections official to not process the ballot until citizenship can be determined. This process will protect American citizens' votes while preventing noncitizens from participating in the federal election in violation of federal law.

A substantially similar letter to this one was sent to the Los Angeles County Registrar-Recorder/County Clerk. Instead of committing to working with the Department to prevent aliens from voting in the upcoming federal election, it sent a letter declining to review the evidence presented to it and resisting our civil lawsuit to compel segregation of those ballots until citizenship could be verified.

I write to make unmistakably clear the legal implications of continuing to send vote-by-mail ballots to those people on the list or tabulating ballots cast by them until citizenship can be verified.

This list was developed through a multilayered, multiagency investigative methodology at DHS that relied upon internal immigration records, data matching, supervisory verification procedures, and more. I am also attaching two declarations that detail this process that support the civil lawsuit filed last week.

The legal consequences for either facilitating or ignoring federal crimes are significant. An alien voting in a federal election is a federal crime—and knowingly facilitating such conduct is equally unlawful. Under 18 U.S.C. § 611(a), aliens are prohibited from voting in any election involving federal offices. This is also a state offense in California. *See* Cal. Elec. Code § 18560(a). And under 52 U.S.C. 20511(2)(B), knowingly violating that state statute in a federal election is also a federal offense. Further, under 18 U.S.C. § 2, anyone who aids, abets, counsels, induces, or procures the commission of a federal offense is equally liable. If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk

[1] https://www.justice.gov/opa/pr/justice-department-charges-28-foreign-nationals-california-election-crimes

becoming aiders and abettors to a federal crime. Any assertion that ballots must be counted simply because California's registration system relies on self-attestation of citizenship does not relieve election officials of their obligations under federal law ***when they are on actual notice of noncitizen voting.*** Nor can state procedures supersede federal criminal statutes.

These federal statutes do not excuse unlawful voting simply because the State employs a permissive registration method. The Department is not asking Santa Clara County to adjudicate immigration status; it is asking it to temporarily set aside ballots from individuals whose eligibility is credibly in question—a standard election-administration practice implemented nationwide.

Others have pointed to the National Voter Registration Act's ("NVRA's") "quiet period." That is misplaced. The NVRA's 90-day limitation applies only to systematic list-maintenance programs—not to targeted, individualized evidence of unlawful voting identified by federal law enforcement. The Department is not requesting a purge, cancellation of registrations, or any programmatic action. We request only temporary ballot segregation pending citizenship verification. Invoking the NVRA to justify counting ballots unlawfully cast is both legally incorrect and operationally irresponsible.

Once the United States provides credible evidence that certain ballots may be unlawful to count, election officials may not disregard that information because it is inconvenient to process. Administrative difficulty is not a defense to violating federal law or aiding or abetting a federal offense.

The Department strongly urges you and your agency to work with the Department of Justice to ensure the integrity of California's federal elections before taking actions that risk significant federal scrutiny and legal exposure.

Sincerely,

CRAIG H. MISSAKIAN
United States Attorney

# Exhibit B

Case: 26-7303, 11/03/2026, DktEntry: 22.2, Page 33 of 94

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

Defendants.

Case No. 26-cv-12800-TLT

**ORDER DENYING DEFENDANTS' MOTION TO STAY TEMPORARY RESTRAINING ORDER, CLARIFICATION AND MODIFICATION OF THE OCTOBER 30, 2026 TEMPORARY RESTRAINING ORDER SUBSEQUENT TO ORAL ARGUMENT**

Re: Dkt. No. 33

The Court issues this Order for two purposes; (1) to **DENY** Defendants' motion to stay the Court's Temporary Restraining Order ("TRO") issued on October 30, 2026; and (2) to indicate the **MODIFICATIONS** this Court will make to its TRO.

As a preliminary matter, the Court finds Defendants' appeal of this Court's TRO premature. *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306 (9th Cir. 1989) (denial of temporary restraining order is appealable only if the denial is tantamount to the denial of a preliminary injunction). Thus, this Court does not exceed its authority in modifying the TRO. *United States v. Hickey*, 580 F.3d 922, 928 (9th Cir. 2009). As noted in the hearing, and with the consent of both parties, the Court modifies the TRO to reflect an expiration date of November 13, 2026, at 5:00 p.m.

The Court will issue a written Order reflecting the Court's deliberations with respect to its findings regarding Plaintiffs' claims under Section 11(b) of the Voting Rights Act and claims for violations of principles of federalism under the Tenth Amendment and Elections Clause. In addition, the TRO will reflect changes identified below on or before November 6, 2026:

United States District Court
Northern District of California

1. The Court finds that at least some Plaintiffs have established standing in this action. Defendants' conduct has left election workers with ongoing fear and concern about performing their ordinary duties fearing the risk of federal prosecution for failing to comply with the questionable lists of noncitizens created by Defendants with assistance from artificial intelligence. The Defendants conveyed that risk through direct notice or public statements concerning criminal liability. *See, e.g.*, ECF 19-1 ¶¶ 13–14; ECF 19-2 ¶ 17; ECF 19-3 ¶ 14; ECF 23 ¶¶ 23, 29, 34, 38–41; ECF 19-7 at 32, Exs. 4–14; ECF 29-2 ¶¶ 4, 6–7; ECF 29-4, ¶¶ 9–10 ; *see also* ECF 19-8 at 83 (serving a subpoena to an election worker at the workplace and then subsequently at home).
2. Plaintiffs are likely to succeed on their claim that Defendants' conduct violates the Administrative Procedures Act ("APA"). Defendants note that the Court did not address the APA claim in its earlier Order. However, despite the Court's supplemental question and the hearing on November 2, 2026, Defendants have not shown why their conduct did not violate the APA. Based on the record and the prior Order, the Court finds that Defendants are likely to violate Section 11(b) of the Voting Rights Act, the Elections Clause, and the Tenth Amendment, so Defendants' conduct is contrary to law. Defendants' conduct lacks statutory authority and is arbitrary and capricious, in part because of their departure from Justice Manual § 9-85.300.
3. Plaintiffs are likely to succeed in their claim that Defendants' conduct violates principles of Due Process under the Fifth Amendment because Defendants' conduct fundamentally undermines the integrity of the vote. *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998).
4. The relief, which requires Defendants to take affirmative steps, is not prohibited because Plaintiffs establish that the law and facts clearly favor their position. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)

Moreover, the Court **MODIFIES** paragraph 6 of the TRO to reflect the following relief:

*(6)* The Court further ORDERS Defendant U.S. Department of Justice to inform *the court before which criminal proceedings have commenced* of any pending search warrant applications, grand jury subpoenas, or other demands to access election materials or ballots pertaining to any list of individuals alleged by Defendants to be ineligible to vote, or compel testimony related thereto. *Such information shall be presented for in* camera *review along with a copy of the lists provided to the Registrar of Voters and/or any Election officials, administrators, or employees.*

The Court modifies the briefing schedule on Plaintiffs' request for a preliminary injunction as follows: Defendants' shall file an opposition to Plaintiffs' request by no later than **5:00 p.m. on Monday, November 9, 2026**. Plaintiffs' optional reply shall due on **November 10, 2026 by 5:00 p.m.** Absent a request from all parties, the hearing for the request for Preliminary Injunction is maintained for **November 13, 2026 at 11:00 a.m.**

Considering the filings and responses to this Court's written questions, and the questions presented at the hearing, the Court acknowledges that this matter has been thoroughly briefed and argued. The parties are invited to take Plaintiffs' request for the issuance of a preliminary injunction under submission based on the filings received by the Court to date. Should either party wish to offer any new arguments or evidence in support of or opposition to Plaintiffs' request for a preliminary injunction, that party shall notify the Court of their intent to do so. Each party shall notify the Court of their intent to either (1) submit on the preliminary injunction request or (2) offer new evidence or arguments by no later than November 4, 2026, at 9:00 a.m.

*Written Order to follow.*

Again, this order expires on November 13, 2026, at 5:00 p.m.

IT IS SO ORDERED.

Dated: November 2, 2026

TRINA L. THOMPSON
United States District Judge

United States District Court
Northern District of California

# Exhibit C

**COURTROOM DEPUTY:** Now calling case number 26-cv-12800, Service Employees International Union AFL-CIO, et al vs. United States Department of Justice, et al.

Counsel, could you please approach the podium and state your appearances beginning with the petitioner.

**THE COURT:** I will allow everyone to assemble at counsel's table. As a courtesy, wait on opposing counsel as well.

Please approach.

**MS. LEONARD:** Good morning, Your Honor.

On behalf of plaintiffs SEIU, AFSCME, LULAC, and NAACP, Danielle Leonard from Altshuler Berzon.

I'm accompanied by several members of our co-counsel team.

**MS. LEYTON:** Good morning, Your Honor.

Stacey Leyton also from Altshuler Berzon also on behalf of all plaintiffs.

**THE COURT:** Good morning.

**MS. CHAN:** Good morning, Your Honor.

Connie Chan from Altshuler Berzon also on behalf of all plaintiffs.

**THE COURT:** Good morning.

**MS. CHISHOLM:** Good morning, Your Honor.

BJ Chisholm from Altshuler Berzon also on behalf of all plaintiffs.

**THE COURT:** Good morning, counsel.

**MR. JONES:** Good morning, Your Honor.

Colin Jones also from Altshuler Berzon also on behalf of all plaintiffs.

**THE COURT:** Good morning.

**MS. JACKEL:** Good morning, Your Honor.

Sarah Jackel from Democracy Defenders Fund also on behalf of all plaintiffs.

**THE COURT:** Good morning.

**MR. KAO:** Good morning, Your Honor.

On behalf of the Federal defendants, Assistant U.S. Attorney Kenneth Kao. I'm joined by my colleague Kelsey Helland this morning.

**THE COURT:** Your colleague once again. You moved your head and I want to make sure my court reporter was able to hear the identification.

**MR. KAO:** Kelsey Helland.

**THE COURT:** Thank you. Thank you, counsel, much appreciated.

Now one thing I want to do is first just discuss procedurally how this case came to my department and the timing because that may require some adjustment because if you look at the electronic file, you will see that originally the preliminary injunction hearing was set for November 13 with what would have naturally been the same day of the expiration.

My courtroom was informed that there was a motion pending to determine whether this case was going to be related to a case in another department and further advised that there might not be any filings until Monday which then led to further dates being pushed out.

I began working on the case because I was concerned, but I noticed that there was a delay in even indicating whether the case was going to be related or not until almost 4:00 on a Friday. So this put things in quite a quandary in terms of timing. So if any counsel can give me some clarity about that because when I look at the docket, I thought by 1:00 there was going to be some clarity about whether this case was going to remain in a different department and then it went into an abeyance until almost 4:00 in the afternoon but I did see some filings starting to take place. So can someone give me some clarity about that.

**MS. LEONARD:** Sure. Danielle Ladies and Gentlemen for the plaintiffs.

Thank you, Your Honor.

We were under the same state of flux as Your Honor was. I believe the case was originally assigned to Judge Pitts who was a former partner of our law firm and then recused. From our perspective as counsel in the case, we then await the reassignment from the clerk's office and the Court, as Your Honor does, and then I saw that -- we saw that there was

activity around another case in front of -- the *California Nurses Association* case in front of Judge Martinez-Olguin begin and Your Honor's notice once -- for us to respond whether our position on whether they should be related. We were in real time obtaining the same information.

We did, however, upon filing of our complaint very late the night of Thursday, the -- the Thursday night. Sorry. The Thursday night October 29th I believe it was in light of these rapidly developing and escalating threats, we notified -- I personally notified counsel for the Government, I believe it was at 6:00 a.m. or shortly thereafter, Pacific Time, of the filing of the complaint and our intent to seek a TRO in asking for relief that day. So defendants were certainly on notice we were planning to come in to do that.

And we understand we could not notify Your Honor's chambers of that intent at that time because obviously it was before the Court opened, and when we were first assigned to Judge Pitts, then that set in -- this sort of fluctuating time period where we weren't sure which judge we were going to be in front of.

Does that answer Your Honor's question?

**THE COURT:** Somewhat. It was just that we received a communication that this case may end up staying with a different judge who was assigned to the *Nurses* case and so that we were to sit in abeyance until there was some clarity about

the relationship and for us to file a request that that judge make a final determination so I know that there was some discussion before the case landed with me and I'd like to hear from the Government on that issue.

**MR. KAO:** Thank you, Your Honor.

If I may add, my understanding is that there were two different cases before Judge Pitts, just to add to the confusion. And both of those were up for consideration on relatedness. So only one of them was actually determined to be related to the CNA, the nurses case. The other one, this one was not.

And so that was happening throughout the day on Friday, and at the same time, I believe it was about 1:00 in the afternoon, that plaintiffs filed their motion for TRO and declarations came throughout that day until the Court's order on the TRO late in the afternoon.

**THE COURT:** All right. And I note that in docket number 26-cv-10680, even in the Government's response about whether the case should be related in their footnote also indicated that there was additional confusion about counsel accidentally focused on the wrong matter, undersign apologizes to the Court for the mistake. So it appears that things were going back and forth relatively quickly and everyone was trying to sort out in the late hour on a Friday exactly was going on and how things were going to settle.

That becomes important because it impacts the expiration date of my order, because if we anticipated that we needed to have a briefing schedule in which uploaded before receiving the TRO, that was in anticipation that something was going to happen and what dates that were commiserate with that and all of a sudden there was a flurry of filings. And even after the Court issued it's TRO, there still were additional filings from petitioner. Is that correct?

**MS. LEONARD:** There were. We -- we had let's just say some difficulty with the ECF system in getting some of our declarations on file.

**THE COURT:** All right. So you can appreciate that with that inn stability, the Court would err on the side of caution as to what would be the outside date for an expiration of a 14 day TRO. With your permission, the Court can make the adjustment to the original date that was commiserate with what we thought was going to be the preliminary injunction date, if not, we can leave it as it is, but at least everyone has context as how that date was arrived at that Monday.

**MS. LEONARD:** Thank you, Your Honor, that is I think from all of the parties involved.

The one thing I will say in response to this was that plaintiffs certainly never changed our plan and never communicated any change of our plan to defendants who were on notice as of very early in the morning that we would be seeking

a TRO with emergency relief that day. They had every opportunity to file something with this court to respond and chose not to and, you know, that that -- that never waivered, Your Honor. That plan was always clear between the parties what was not clear and what I appreciate hearing the other side and getting more information was how this appeared from the Court.

Plaintiff's certainly have absolutely no objection and would support the Court modifying that expiration date.

**THE COURT:** Any objection to that slight adjustment in terms of the expiration date as it appears on the face of the Court's order?

**MR. KAO:** Your Honor, insofar it doesn't change the sum and substance of the TRO, the defendants understand that the Court doesn't want to conform the expiration date to what's statutory allowed. Our position is because now the TRO is now on appeal that there should not be a place for this court to dissolve it or modify it at this point. So to the extent that this court no longer has jurisdiction because the TRO is now being considered by the Ninth Circuit, we just make that reservation.

**THE COURT:** Are you objecting to the Court making that adjustment which is commiserate with the first date in the ECF?

**MR. KAO:** Not to the extent it does not affect the sum and substance of what is being appealed, Your Honor.

**THE COURT:** That expiration date is therefore adjusted to November 13th at 5:00 p.m. which was the originally contemplated time based on the original filings until they were accelerated so I appreciate that. Thank you.

All right. Now then to the heart of why we're here and what we need to address, this is a case that requires us to take our time and time is somewhat elusory because the election is November 3rd, tomorrow.

In addition, the Court is also relying on limited resource and so we have a court reporter until 2:00 so we have time but that time is very condensed.

When I look at this case originally and having worked in the state court and being somewhat familiar with the state process for elections, the certification process and the like, it gave me great pause and concern. Also knowing some history about the Department of Justice in that traditionally the Department of Justice's role in elections was limited. Generally, civil rights division had focused on promoting access to voting and voting rights. The criminal division was designated to prosecute election fraud. After the fact, generally, the Department of Justice refrained from getting involved in elections and deferred to state officials.

The Department of Justice had a policy that required FBI agents and AUSAs to seek approval from the Department of Justice Washington Public Integrity Section to open election

fraud investigation and could not do so without the DOJ's Washington office approval. The Department of Justice had election crime manuals that were publicly available. I don't know if those are still available or if they've been removed.

The Department of Justice never took election documents or materials before the election was certified. The Department of Justice usually acted in coordination with state and local officials. In reciting that history, am I incorrect in that being the history of the Department of Justice as it relates to elections?

**MR. KAO:** Your Honor, I do not have personal knowledge on that. I will say that there is a statute that has been on the books, as our papers indicate, election laws have been enforced for 150 years. 18 USC 601 is on point about election fraud.

The Government is allowed to conduct investigations and to actually prosecute under that section of the Title 18. So to the extent that the states are involved in conducting the elections themselves as the time, place, and manner under the elections cause, we understand that is the case. But that is just the administerial portion of conducting fair elections.

As far as the Government, the Federal government's position, executive, they have every right to conduct investigations, again, under Section 601 of Title 18.

**THE COURT:** And is your position that the language of

my temporary restraining order, 14 days, impacts that role in some way?

**MR. KAO:** Yes, Your Honor. I think that to the extent that it impairs the Government's ability to conduct investigations, that absolutely has an effect on executive's power to conduct these investigations.

**THE COURT:** Okay. Well, we're going to spend a little time talking about just procedurally and given where we are and the -- the usually the 90 day quiet period and whether any of this could be considered disruptive, seizure of election related materials, the presence of Federal agents near poling places this close to the election, and I am very differential to the Federal Rules of Criminal Procedure 41 as well as 6 in terms of -- in terms of election materials. And so I just want to make sure that I am clear about how things have evolved in some of the changes that have historically have taken place in terms of how the Department of Justice in the past worked with local government and state government in making sure that the voting rights of all citizens was secure.

So our first issue is standing. And so, counsel for the Government, you are rejecting the plaintiff's position on standing. They have now fully briefed that section. If you can please identify those areas in which you still feel that it falls short as to the union plaintiffs as well as the organizational plaintiffs.

**MS. LEONARD:** Your Honor, before we proceed, I'm going to cede the podium to my colleague Ms. Leyton who is going to handle standing.

**THE COURT:** Okay. Thank you.

**MR. KAO:** Thank you, Your Honor.

Okay. With respect to standing, Your Honor, our position is essentially the same with -- regardless of whether we're talking about any union members or the nonprofit organizations. Not one single plaintiff was ever delivered one of the letters from an executive agency. This is a question of how much of a case do these plaintiffs actually have in suing the Government.

It's extremely attenuated. None of the declarants that have -- the individuals who have been -- submitted declarations, none of them have been served the letters themselves. So our position is that --

**THE COURT:** Have their departments been served those letters?

**MR. KAO:** They have not been served those letters, Your Honor.

**THE COURT:** No one in their department, no one in leadership --

**MR. KAO:** My understanding is that no letters have actually been served to those organizations themselves and those letters instead were served to state and county election

officials, county registrars.

**THE COURT:** And they oversee those election employees. Would that be fair? Do they have any impact on those employees?

**MR. KAO:** I don't -- I don't believe so. Your Honor.

**THE COURT:** And having reviewed the declarations that were attached to plaintiffs filings, namely ECF 19 and ECF 23.

**MR. KAO:** Yes, Your Honor. Those individuals, again, Your Honor, they -- they are employed by the unions but they indicate individual affect by the policies but they themselves are not -- were never given the letters directly.

**THE COURT:** Okay. Counsel for the petitioners, if you will -- and plaintiffs -- if you will indicate both the standing for the union plaintiffs as well as the institutional plaintiffs and then the Court will proceed should the Court find that there is standing to the next area.

**MS. LEYTON:** Thank you, Your Honor.

The union declaration, so the declarations by Ms. Medina and Sforza, they demonstrate that the union has as members individuals who work in the elections offices across California, in Washington state, and in other states in the country, and that the leaders of those election offices received the threatening letters. But the Department of Justice is attempting to make a technical distinction and say that letters were not personally delivered to the elections

workers themselves, to the employees of these offices.

But we've demonstrated in our papers that the threats of prosecution were phrased broadly to apply to any and all election workers who participate in the processing of ballots of individuals who were on defendants fraud lists. And we've also demonstrated that defendants broadly broadcast these threats in both the traditional media and on social media, broadcasting that any one in these offices could be guilty of aiding and abetting a Federal criminal office if they processed the ballots of individuals who are on that lists.

We've also document in declarations from both the unions and election officials that this has had a chilling -- that this has a chilling effect, that this places individuals under the threat of prosecution, and that that is more than sufficient for standing under this circuit's case law about threats of prosecution.

As far as the nonprofit plaintiffs, both LULAC and the NAACP have submitted declarations showing that they have members across the country, that many of those members are naturalized citizens, and that they have good reason to fear that they appear on the fraud lists that the Department of Justice and Department of Homeland Security are relying on. That is similar, if not on all fours, with the standing that was demonstrated in *Mi Familia Vota*, which is still Ninth Circuit case law even if cert has been granted and in the

*California Nurses Association* stay decision where that was held sufficient for standing. This is affecting the members of the NAACP and LULAC. It's also affecting the core organizational activities of those organizations because their efforts to get people out to the polls and to participate in the voting process has been hampered and made more difficult by defendant's actions.

**THE COURT:** How would you define intimidation if you had to give a definition?

**MS. LEYTON:** Your Honor, the case law provides that under the Voting Rights Act that it is a -- it is whether a voter would reasonably be intimidated or an elections worker would be reasonably intimidated. I don't think we've seen a case where the Federal Government has actually threatened criminal prosecution. In many of the cases we cited, the level of intimidation was far less threatening to individuals than in this case.

So the Court does not need to find the threats are having the effect of actually intimidating somebody, actually stopping an election worker from processing ballots. Many of the union members are very courageous and going ahead with following state and Federal election law and processing ballots. But what this court can find is the threats of criminal prosecution that are being broadcast widely could have a reasonably intimidating effects on voters and on election

workers.

**THE COURT:** Reading from *Kennedy v. Meta Platforms*, and this was decided in 2024 in this district, although not recorded, intimidation includes messages that are reasonable -- that a reasonable recipient familiar with the context of the communication would view as a threat of injury to deter individuals from exercising their right to vote. Unlawful threats or intimidation need not be violent or physical and may include communication, inspiring fear of legal consequence, economic harm, dissemination of personal information, and surveillance. And I emphasize dissemination of personal information.

Examples of threatened legal consequence that a reasonable person familiar with the context would view as a threat of injury to deter her from voting include threats that police will use the voter information to find and enforce old warrants; patterns of baseless arrests at voter registration events; threats of deportation against lawful citizens who are immigrants and their family members; and threats of filing a lawsuit against someone or suspending them without pay. These are examples of threatened economic harm that a reasonable person familiar with context would view as a threat of injury to deter her from voting, including threats of adverse economic consequences such as threatening to personal information -- to send personal information to debt collectors or outstanding

debt, evicting, or threatening to evict, and including local merchant.

Further, additionally, publishing names, addresses, and phone numbers of registered voters in a report accusing them of committing various felonies also constitutes threats and intimidation under Section 11(b) both because of the clear effort to subject the named individuals to public fear or harassment and interference with their right to vote that the named individual experience.

Now this is contained within the *Kennedy v. Meta Platforms* case and I thought it was illustrative in terms of how we defined intimidation and its consequence. And when I saw that there were these lists, if you can delve a little further with regards to the declarations that you've provided that you feel on all corners satisfies this court that all parties that are named plaintiffs here have standing.

**MS. LEYTON:** Certainly, Your Honor.

We've demonstrated in the declarations by SEIU and AFSCME that they have members in the California counties where elections offices have been threaten. And we've submitted declarations from county election officers from Santa Clara, in particular, and other counties that have demonstrated the chilling effect that those threats would have on a reasonable election worker.

**THE COURT:** Now speaking of Santa Clara County, is

that the declaration where the individual said they started making preparations in the event something were to occur and the fellow employees are those that were being supervised by that individual could continue on with their job?

**MS. LEYTON:** I believe that is correct, Your Honor.

**THE COURT:** All right. And you consider that a tangible fear?

**MS. LEYTON:** Yes, Your Honor. It's a fear that any reasonable individual would have given the threats of prosecution and social statements on social media that everybody is going to go to jail, yes. And that those steps have actually been taken.

**THE COURT:** When you say those steps have actually been taken, elaborate just a little so I understand.

**MS. LEYTON:** That grand jury subpoenas and individual subpoenas and letters have been delivered to elections offices. The injunction does not enjoin criminal investigations, but that -- the existence of those grand jury subpoenas and the fact that criminal prosecutions appear to actually be being pursued at this point demonstrates the reasonableness of the fear of elections workers and election officials at this time.

**THE COURT:** And are there -- strike that.

Most election workers within various counties tend to have an age demographic, for lack of a better term. It's their first job. It's their firs time getting employment at a county

job, some are more seasoned workers, but there are a lot of individuals that are fairly youthful that are working in the registrar voter office and actually at the booths where individuals are dropping off their ballots. Can speak to any of that and how that impacts perhaps someone who doesn't have some longevity at their job and how that might impact them in terms of these letters and these communications.

**MS. LEYTON:** Well, Your Honor, that would certainly heighten the reasonableness of the fear for the people who are new to elections. I would submit is what the Government is doing in this case is so unprecedented that even though those who are seasoned and do have experience would not have experienced this level of threats and pressure.

The other thing we've shown in our declarations is that many election workers are temporarily assigned to the elections office so they may be employed by LA County, for example, in other departments and they are tasked to the elections office for the surge of work that takes place during an election, so those individuals would also not be seasoned within the office of elections but would be coming in for a period of months around the time when the work is most the intense. So the idea these county workers who are being tasked briefly to the elections office are now being threatened with criminal felony prosecution would certainly heighten the reasonableness of the threat.

We've also submitted in the declarations something that I didn't mention in both the Washington State declaration and the AFSCME declaration that there have been as a result of the attention to this from the Federal Government's threats that election workers will be prosecuted for facilitating noncitizen voting, there have been anthrax threats, there have been threats sent to election offices. There is public scrutiny from private citizens that has been spurred on by the Federal Government's public statements.

**THE COURT:** And has there been any presence of any Federal Marshals or other law enforcement individuals associated with the Federal Government at the ballot locations, the ballot drop off locations?

**MS. LEYTON:** I'm not aware of any as implicated by this case. I am aware that Federal Marshals delivered some of the subpoenas both to elections officials at their place of work, which is where all of the elections workers also have their place of work and some election officials at their homes but I'm not aware of any poling place presence as implicates the issues in this case.

**THE COURT:** And speaking of at their homes, I believe one the declarations mentioned that one of the officials was served at their home and then served again at their workplace. Is that correct?

**MS. LEYTON:** I believe the order -- I believe that is

true but that the order was they were first served at their workplace and then served at home, which we would submit illustrates the threatening and intimidating effect that the Federal Government is attempting to have in this case because there would be no reason to serve somebody a second time at their home unless it is part of an effort to intimidate.

**THE COURT:** Anything further as it relates to standing or anything you think I may have overlooked in reviewing your declarations that was submitted?

**MS. LEYTON:** Nothing further, Your Honor. I know we submitted a lot of declarations so I appreciate your attention it to the detail.

**THE COURT:** At least you know I read them.

**MS. LEYTON:** Thank you.

**THE COURT:** All right. Counsel.

**MR. KAO:** Thank you, Your Honor.

Just one additional point. I do think that the underlying premise with the reasonableness of -- the reasonable fear that these individuals may have is based on knowledge of performing some sort of criminal act. So all of the communications that -- and all of the media quotes that have been presented talk about individuals will be prosecuted for knowingly allowing illegal citizens to vote.

It's not about --

**THE COURT:** The objective information that coincides

with the suspicion has there been some objective information that has led the Government to believe that in these places where these subpoenas have been served that there has in fact been some transgression?

**MR. KAO:** The subpoenas or the letters? You're referring to the letters --

**THE COURT:** The --

**MR. KAO:** The letters, Your Honor -- the letters specifically talk about a knowing violation of 601 because they're allowing an illegal citizen -- illegal alien to vote. And so this goes back to just law 101, the mens rea requirement. If there is no intent or knowledge of an individual allowing or aiding and abetting someone to vote who is --

**THE COURT:** No, I understand mens rea and law 101. What I'm concerned about is what data is there and how is a person put on notice so that they are knowingly aiding and abetting something. They have to know something in order to aid and abet so I'm -- the concern is how we get here.

**MR. KAO:** Your Honor, that is the entire investigate purpose of the letters to begin with. The reason why the letters were sent was to try to get the cooperation of the county and state registrars to be able to segregate certain ballots, a certain number of ballots --

**THE COURT:** California versus --

**MR. KAO:** Yeah.

**THE COURT:** We already had a decision on that that said we're not segregating these ballots.

**MR. KAO:** Right. But that was the intended purpose to identify which individuals may have not -- may have not been a valid voter.

**THE COURT:** This is where it gets curious because when you say may, it makes me pause because I'm wondering what is the underlying impetus of all of this. Is there a list and does that list coincide with the reality of people who are registered voters. I'm trying to understand where does this data come from, how is it generated.

**MR. KAO:** Yes, Your Honor. And I don't know if you had time, everything is happening so quickly, but along with our response to the Court's questions, we did submit two declarations and two supplemental declarations from the same individuals. We talked about the process and the methods by which those lists were created so they were attachments.

I know that we just got them in one hour ago. I don't know if the court had time to look at them but --

**THE COURT:** I would like you to explain it on the record.

**MR. KAO:** Yes, Your Honor.

It's very thorough method that takes into consideration different records and databases that the

Government has at its ready related to immigration, and it also includes other components that may be able to determine validity of the lists. So that list has been called down. It's gone through a number of different levels of review and then --

**THE COURT:** Error proof?

**MR. KAO:** No, Your Honor. It's not error proof.

**THE COURT:** And are there -- does it compensate for those who may be naturalized citizens and is it time stamped as to when that list was generated?

**MR. KAO:** I think the list is -- it's a live list, Your Honor. It's been ongoing -- there was a list that was actually sent in the *California* case so to that extent it's discerning, but my understanding of how it works is from these declarants the list is continuing being worked on, called down to try to further refine given different information points. And one of the purposes of this investigation was to try to get some sort of collaboration with the state and county registrars.

**THE COURT:** How long does it take for the state to certify their voting records, their ballots? What is the time span for certification?

**MR. KAO:** Your Honor, I believe it's -- if I remember correctly, I know that the county is maybe 30 or 60 days. It's just generally a good amount of time following the actual

election day.

**THE COURT:** And what -- in what way would the Government be prejudiced to wait until ballots are in, they've been counted, the registrar voters office has the chance to look to see these are registered voters, we can certify these votes, and then your investigation begins without interfering with the right to vote of those citizens who are entitled and eligible to vote.

**MR. KAO:** It's partly an issue of timing, Your Honor. It's partly an issue of putting the cart before the horse.

I think first and foremost we want to know that fair and free elections are done by valid voters. We don't want to have to post hoc look at some election results.

**THE COURT:** But why is it imperative to do it now when we're just about to have an election tomorrow?

**MR. KAO:** As a practical matter, Your Honor, I don't know if it can actually be done between now and tomorrow, but I -- insofar as we want to be able to -- to have as fair an election as possible, that is I think everybody's goal.

**MS. LEYTON:** Your Honor, if I may respond to just a couple statements. And I believe my colleague, Ms. Leonard, is going to to address the unreliability of the lists as found by Judge Carter in the Central District of California.

But if I may make one brief point which is that the representative from the Department of Justice has said that

elections workers can't be guilty of a Federal crime unless they have mens rea, that they are knowing counting an unlawful ballot. We certainly agree we do not believe that elections workers are guilty of a Federal crime, but the defendants have there threatened that they are and I would point Your Honor to paragraph 95 of our complaint and to the Moreles declaration, Exhibit A, which is the letter that Santa Clara County received and which we believe was sent to all of the counties which says --

**THE COURT:** The same individual who is making plans in case there's an absence of some kind?

**MS. LEYTON:** Yes. Yes. I believe that is correct, Your Honor.

And in that declaration, it says that -- the letter sent from the Federal Government says if persons knowingly tabulate ballots cast by individuals identified by Federal agencies as noncitizens -- what they are telling election officials and election workers is if you count the ballots of people who are on these lists, you are at risk of being prosecuted and that threat and effect of that threat and the unlawfulness of that threat does not depend on whether the people could actually be prosecuted, or if a prosecution was initiated whether they would actually be convicted because the Federal Government has made that threat about individual voters who appear on those fraud lists, and I believe Ms. Leonard is

going to address the lists in greater detail.

**THE COURT:** Okay. Counsel.

**MS. LEONARD:** Thank you, Your Honor.

The declarations that were filed with this court an hour ago are exactly the same declarations that were filed in the Central District of California. I don't believe the Government revealed that to the Court. I am.

Those are the declarations that were found by Judge Carter to be unreliable and for many reasons. And that, as Your Honor is well aware, has now gone up to the Ninth Circuit twice where the Ninth Circuit has denied the stay and recognized the unreliability of these materials.

And the process -- just to put some real meat on the bones here, the process by which the Government did this, that they obtained these lists -- because they could not obtain the voter registration roll unredacted from the states under Federal law as I believe 31 courts have held -- that's how they started. They started trying to get the voter list because they wanted to go on this hunt for noncitizen voters.

They started with they wanted those lists. They couldn't get them. So they concocted a process, DOJ and DHS have been working together for months, Your Honor -- this is why this is a policy and plan under the APA, we'll get to that part that we are saying is unlawful. It's the culmination of decisionmaking to do this very thing. This is their plan.

**THE COURT:** The Government was silent on the APA claim questions that the Court placed in the docket.

**MS. LEONARD:** And we will -- I will get to that later. I want to put a pin in that.

But this is the plan. This is their concerted plan to take and make their own lists. Where do they get the data? Someone, as they told Judge Carter, someone bought it from the State of California redacted, and gave it to the United States. They redacted the date and the name of the person who gave that data to DHS and DOJ.

So Judge Carter asked when did this come in? The voter register rolls are also a live thing. If you're using a list from 20 -- from 2025, people could become naturalized citizens subsequently, there are a lot of changes. No one knows because they will not reveal when they got the data. No one knows because they will not reveal from whom they got this data. No one knows because they will not reveal was it alternated, Your Honor.

Chain of custody is very important in such matters. They won't reveal the information. So that's the starting point then they do analytics, third-party analytics. Okay. That's commercially available AI outside of the Government that they applied to the data to ad Social Security numbers, Your Honor. That is what came out.

**THE COURT:** Private information.

**MS. LEONARD:** But also inventing it, Your Honor. These are not people's actual Social Security numbers. They used AI to say this person with this name at this address, we think that's the Social Security number. Well, what if that person is -- has -- lived at the same address as his grandfather and has the same name and the grandfather is a green card holder but the grandson is a voter and is a citizen.

They generated, using analytics that they won't explain that are completely unreliable, would never pass the laugh test of an expert declaration in a Federal court, generated social security numbers, then now we go to step three, they matched those against Federal databases that are replete and known to have profound rates of error with respect to citizenship such as the Social Security administration's databases which are not intended to be a Federal citizenship list because Congress has said there shall not be a Federal citizenship list used for these purposes. Congress has rejected the administration's attempt to create such a thing.

So they match against faulty --

**THE COURT:** You have some tension with Article I Section 1 and Section 4 in this case.

**MS. LEONARD:** Well, it's this -- the goal here is to create procedures that are not reflected in the law and to use the threats of criminal prosecution to obtain and coerce a result that they could not get through legal process. That's

the case, Your Honor, and they're using election workers as tools and caught in the cross hairs for that unlawful purpose.

But the -- so they use the faulty databases with known error rates. All the cases we cite in our papers that have found these error rates, there have been a lot of cases about the generations of these lists. Then they cull the list -- they described the subjective process where someone looked at this result of this hodgepodge and then someone at DHS has decided is that person a citizen, I think so, they don't describe how they do it.

So that's how they ended up with this list of names. It is completely unreliable. They admit defendants in case after case -- case after case on the record in court admitting there are error rates, I think we just heard that today it's not error free. That means every single person on that list is a lawfully registered voter.

Their point is we think they might be not citizens because of their name, because of an AI generated Social Security number, and you have to take our word poll workers in California, Washington, across the whole country, Your Honor, you have to take our word based on this junk data, Your Honor, and if you don't take those ballots out of processing, we will criminally prosecute you. That is coercion in addition to threatening behavior.

It is intimidating for all the reasons my colleague,

Ms. Leyton, explained and all of the reasons our declarants under incredibly compressed time frames had explained to the Court it violates Section 11(b), it violates the 10th Amendment, it violates the voter who are affected by this, it violates their constitutional rights, it violates the APA.

There is no statutory authority. They cannot derive statutory authority to intimidate, coerce, and threaten elections workers in a criminal statute that allows for the investigation of individual voter fraud. They just can't do it, Your Honor. It's also profoundly arbitrary and capricious.

**THE COURT:** Okay. We'll go back to -- and I want to give an outline where we're going to go from here because I do want you to really flush out the constitutional claim, the 11 -- we probably should start with the voter act rights 11(b) and so it's succinctly placed on this record since we have tandem proceedings going on.

I cannot say in my experience, and it's limited on the Federal bench, four years, that I've seen where there's a temporary restraining order, ex parte request, based on limited information from the ex parte request and at the same time counsel files an appeal in the Ninth Circuit and there's competing briefing schedules which exhaust everyone because we're now all having to -- counsel is having to burn the midnight oil and now be in not only the trial department but also the reviewing court when there -- it's premature we

haven't even flushed everything out yet.

So this is an odd set of circumstances and so we're going to go back and make sure that we're hitting all of these claims.

Now, counsel, I will allow you to respond to the claims made by the petitioner but the next segment will be Section 11(b) of the voter rights act. Then we'll go into the constitutional claims and we will discuss the APA claims as well given the evolution of this case, Judge Carter's decision, and the decision in the *Nurses* case.

So starting now with any response you'd like to make to the arguments of counsel and then going straight to Section 11(b) of the voter right act.

**MR. KAO:** Sure. Just briefly, Your Honor.

To wrap up to this part of the discussion, Your Honor, I did indicate to the Court that those declarations were first filed in the Central District case before Judge Carter. In our response, we say that it's part of California one that those declarations were originally filed. I think the difference here is plaintiffs take the position that the list was compromised of lawful registrants.

That is not the same thing as a valid voter. Just because someone is able to lawfully legally register in the State of California does not mean that that person is -- is a valid voter. The purpose of the Government's request of the

different registrars was to help determine that fact based on the information that the Government had given to the county and state registrars, this a list of the individuals, as imperfect as it may have been, but we want you to help verify that these are not just illegally -- or illegally registered voters but that they are valid voters and understanding that some -- it may not be a perfect list. That was the entire basis for us -- for the Government making that request at the registrars in the first place.

**THE COURT:** But if I'm hearing that the list is flawed and that it is over inclusive and includes individuals who are eligible to vote, that is a problem.

**MR. KAO:** Well, which is why they are not saying that these people cannot vote, the effort was to try to get those voters identified before the election day.

**THE COURT:** But you're giving a list and then you're asking and you're claiming that this puts workers on notice of individuals that they need to screen out as voters as being ineligible and you don't find this disruptive right at the time of the election and that there isn't a less onerous alternative or one that creates let interference, particularly when there's a high, from what I understand, a high error rate in this.

**MR. KAO:** Yes, Your Honor.

**THE COURT:** That there's a high error rate?

**MR. KAO:** Understandably which is why we need to have

this audit done.

**THE COURT:** Would you agree there's a high error rate, not nominal, but a high error rate?

**MR. KAO:** The list itself.

**THE COURT:** Yes, sir.

**MR. KAO:** I think that's a fair statement. But that is, again, the entire reason why we does ask for the registrar's cooperation to verify that these are actually valid voters.

Now the Court's earlier point about the timing of this, why not have this all done before election day and you had also inquired of the Government earlier how long it takes to certify the vote once election day is over. I believe that there -- this effort of trying to get the cooperation to validate the list could go on after -- and commiserate with the certification of the vote itself. So there's no reason that the county registrars would not be able to look at the list after tomorrow --

**THE COURT:** But if you have a flawed list and a list that is evolving based on flawed information, in any other arena, that list would be thrown out. Would you agree?

If this -- if we were in the middle of a trial, for example, and as an able-body prosecutor, if defense offered something and there was a high list of error, you would be asking the Court to throw that out. Would that be fair?

**MR. KAO:** In that context, yes, Your Honor, but this is different. This is the reason that there is certification of votes to begin with. The entire reason that we don't decide on November 4th who won the election is because the votes need to be certified. That is the certification process.

Again, I know that that time frame differs from county to state, state to state to actually validate the election and verify the election itself. So as part of that process, why not include this practice of actually taking that list and having and ensuring ourselves for the purity of the vote that the people that actually did vote on that day -- because we're not asking that they not vote.

**THE COURT:** When we have an impure list you're --

**MR. KAO:** They will -- the purity of the list can be determined at any point in time. Of course we want it done in advance of the election, but as part of this certification of a vote, there's no reason that it can cannot happen afterwards.

**THE COURT:** All right. If you'll now address the Section 11(b).

**MR. KAO:** Your Honor, is there a particular question that you wanted me to address in the -- your list of questions provided to the parties earlier or?

**THE COURT:** If you have nothing further on that argument, then you can surrender the podium to the petitioner and she can complete any further argument she'd like to make on

11(b) and then move into the constitutional claims.

**MR. KAO:** Your Honor, I would like to address any specific questions you have otherwise I think our position is stated in the papers.

**MS. LEONARD:** This does -- it's responsive to what counsel just remarkably said to this court but it also pertains to 11(b), Your Honor.

Counsel is trying to characterize the threatening and coercive letters that his bosses at the U.S. Attorney -- sorry -- at the U.S. Department of Justice at the highest levels sent to state and county elections officials that didn't just ask them to verify some information. I think Your Honor doesn't need to set common sense at the door of this courtroom.

They weren't just asking on their face to verify some information. They were demanding within 48 hours that those officials not process the votes during an ongoing election. Let's not kid ourselves about what the facts are. And that's a factual finding Your Honor can make that this is not a request for verification.

If counsel is trying to say it's all within law enforcement investigatory authority because we're not intimidating or threatening anyone or coercing anyone, you just have to look at the face of the letters themselves that ask for -- they do two things. They say you must do this or else we will do that. You must do this thing that we want, you must

set aside these votes of this list that counsel says is impure which is a loaded term. That we will set -- that you must set these aside and if you don't, we will come for your people. We will come for these workers. Er will threaten them with criminal prosecution.

And that is coercion, Your Honor. This is a threat. That is intimidation that falls squarely within 11(b).

We briefed in the papers why that statute applies even if they're claiming it's law enforcement activity, it has long applied to the use by law enforcement officers of such tactics and that's exactly what they're doing here and it applies to every election official and worker in this country. That's who they've threatened and they're trying to achieve -- the reason it's coercion is they're trying to achieve the substitution of the lawful procedures by which we conduct elections all over this country to protect our democracy with a vision of what those procedures should be, too late and without any authorization under the law.

So the goal is to substitute these procedures that counsel was talking about. Why don't we just, you know, look at the list, why don't we just make sure everyone is a voter. There are laws about this, Your Honor. That's what the Trump -- sorry -- the *United States v. California* case talked about at length about why the Federal Government doesn't have the right under the 10th Amendment to substitute its view for what

those procedures should be. Those procedures are given to the states unless Congress takes them away. Congress has enacted no law that takes them away.

So their arguments -- going back to 11(b), their arguments under 11(b) that this is not coercion, I would say it's coercion to achieve an unconstitutional result, which is the Federal Government's view of the procedures that should be in place. And the fact of coercion is shown by the threat of if you don't do this, we will do this. And the "this" is a very heavy handed threat of criminal prosecution of election workers merely for tabulating ballots, for processing ballots, for doing their work, doing the hard work of our democracy because any of those ballots are associated with these faulty lists. That's a straight up 11(b) violation, Your Honor.

Their other arguments we've addressed in the papers. They're not -- if Your Honor had some questions about that, we're happy to submit on the papers.

**THE COURT:** You've adequately answered those questions in writing as well as in the courtroom.

If you can move to the APA claims at this time. Counsel for the Government indicates that this court cannot even entertain that argument since the Court did not address it in its temporary restraining order which was an ex parte application to maintain the status quo until all parties could be heard.

You can proceed.

**MS. LEONARD:** Sure. First on the jurisdictional question, I think we briefed Your Honor's question, and we think the law is quite clear that given that their notice of appeal was premature, Your Honor does have the authority to modify that temporary restraining order to add analysis with respect to the APA and that can inform whatever the Ninth Circuit chooses to do should they choose to opinion to pursue that appeal. And they don't cite any law in their response which says no you can't.

So they jumped the gun, Your Honor, in taking this up to the Ninth Circuit. I think the comments that this is an unusual circumstance are absolutely correct. They could have come back to this court with their arguments for the stay, as they did after they appealed and asked Your Honor for clarification, but instead they chose the parallel track. That's the reason we're here in this parallel proceeding, but it does not remove -- that premature appeal from a TRO. Which is a non appealable order, does not remove jurisdiction from this court.

Now, having said that, you could also I suppose in the alternative make it an indicative ruling which is something you could do whenever there's another issue up on appeal but you don't have to.

Moving on to the APA --

**THE COURT:** Please.

**MS. LEONARD:** Two types of final agency action here that we have alleged and submitted sufficient evidence at the TRO stage to meet our burden of showing a likelihood of success. There's the plan. I talked about the months, months by which DOJ and DHS have worked together to concoct these lists and then the plan to use them in exactly the manner they are using them now, which is to threaten if you don't do this, segregate the ballots, then we will do this, criminally prosecute.

So there is a plan to engage in threatening, intimidating coercive action towards state and Federal -- I'm sorry state and local election workers that comes from the highest levels of DHS and DOJ. The highest levels, Your Honor, have come up with this plan. They are executing that plan through implementing action. Both of those things are final agency action, Your Honor.

*Bennett v. Spear*, the culmination of decisionmaking that has real effects, that's it. We don't -- it's not formalistic tests. We've -- Your Honor asked questions about the herring case. I believe it's the Herring Association. I always forget which fish. I think it's herring.

That's exactly the type -- you know, that's on all fours with this. It talks about a lot of the different ways that *Spear* should be applied in these circumstances. And then

the implementing actions. You do have to wait for every last implementing action to have taken place. You don't have to wait for a letter to go to every county official in the country if the policy and plan in the final decisionmaking has been made, and we believe there's sufficient record evidence that that -- that supports that likelihood of succeeding on that and that gets you the APA.

And the power of the APA is the remedy of vacatur. The power of the APA is the interim relief under 705. And Congress said we want to rip these things out by the root. Unlawful action by our Federal Government, it's -- it's -- the APA has been described as part and parcel of the separation of powers in this country in the checks and balances. The APA gives the Court the authority to stop the unlawful action across this country under 705, the interim relief provision.

Now how do they violate the APA? In three ways. Their actions are contrary to law. We've listed the statutes that we think -- and constitutional provisions that they are violating.

They exceed authority. That's different from contrary to law. Contrary to law is the direct 11(b) violation. Exceeds authority means agencies are a creature of statute. DHS and DOJ have no authority but for the authority that Congress has given them.

Congress has not given DOJ or DHS the authority to run

around and threaten and coerce elections workers --

**THE COURT:** And that's where I indicated that the tension -- there's some tension with Article I Section 1 as well as Section 4 given this policy, plan, and decision.

**MS. LEONARD:** That's absolutely right, Your Honor. I believe strongly that when agencies -- Federal agencies exceed the bounds of their statutory authority they are intruding on Article 1.

The courts have -- I would say it's fair to say the line of when it's simply -- and exceeds statutory authority, APA violation and when it becomes a constitutional violation is not perfectly clear in this context of the TRO and likelihood of success. I think it's sufficient to say they have exceeded their statutory authority because they have none for the actions at which we aim.

And we're not talking about all law enforcement activity as they claim in their papers. Your Honor's TRO and our motion is targeted at these acts of threats that this case is -- we haven't, you know, alleged that the creation of the list was unlawful, it's the use of the lists in this particular way that we are talking about. So that exceeds statutory authority, it's contrary to law, and that action is profoundly arbitrary and capricious and that links with two things.

The list creation that they are using is unreliable and fundamentally flawed. They -- the State Farm standard for

arbitrary and capricious behavior, they have to -- at the time they make the decisions, they have to take into account -- it has to be both reasonable and reasonably explained and they have to into account significant aspects of the problem that they are creating.

And here, there is a whole host of things that the Federal Government -- these agencies in making these decisions have either ignored or not addressed or discounted in a way that doesn't reflect the law, including the rights of lawfully registered voters, those who were caught in the error rate on these lists and will be disenfranchised as a result of their actions.  They have not given sufficient or any weight to those rights all balanced against this specter of one additional, ineligible vote.

They're actually disenfranchising people who have the lawful right to vote on the hypothetical assertion that one extra vote might be added in.  That's not appropriate.  That doesn't give due consider to all the factors they are should have considered.  The effect on election workers, they ignore that too.

They just turn a blind eye to the harm that they're causing to real people across this country who are just trying to do their jobs, civil servants trying to do their jobs all over this country under incredible pressure and a microscope, really.  Those election workers and what they have to do and

detail and get it right and they're ignoring the effects of the decisions that they have made and they flip-flopped on the policy. As Your Honor talked earlier today, they -- DOJ used to have a policy of noninterference. I believe it's gone. These actions certainly make clear that it's gone.

But there are many reasons why if you look at this under the standard rubric of APA arbitrary and capricious analysis under the State Farm factors, this doesn't come close to passing the test, Your Honor.

**THE COURT:** All right. And counsel for the Government, as counsel was going through her argument, one of the most heightened fears that I have in listening to this is you have an election worker who has relied on a flawed list, someone on that list by all other corners appears to be eligible, suitable, but then that worker is now at risk of being arrested for having processed that vote and it's not found out until years down the road because of bureaucracy or what have you that that list was flawed, that list was wrong, and now you have a worker who has gone under scrutiny, stress of being the focus of an investigation, and as you know, the mens rea is something that's usually developed through circumstantial evidence. It's not something that's always readily apparent.

So I just have concern that this all seems very fluid and without -- without assurance that innocent people, meaning

election workers and voters who are eligible to vote, aren't disenfranchised. It seems like we have two competing problems here and something that could be remedied after the certification because that's the job of the State is to certify their own election records and determine whether individuals are valid voters.

And when I think about this, you know, I do recall when Ronald Reagan was in office he said trust but verify. But he also said the right to vote has been long understood as the jewel of the United States. He said that when he extended the Voting Rights Act. And so when I'm looking at this, we all agree that the Voting Rights Act, the ability for members of our community to be able to vote for leadership of their choice without fear, without interference is a hallmark of the United States.

But to start it out on a list that you all create that you cannot vouch as being a valid list gives a lot of pause and concern as to where we're going. Article I and article II are there to protect against this very kind of thing in terms of what the scope of everyone's duties are. Article I, Congress is the one who is going to make the law. Article II clearly tells us what the executive power is. Article III tells me my job.

And there are constitutions sitting on the tables that -- podiums that you're standing at. And it's pretty clear. So

your response as to relates to counsel's argument.

**MR. KAO:** Yes, Your Honor. And the hypothetical just presented about a worker who is processing a vote that years later turns out to be a bad vote --

**THE COURT:** Turns out that that person was entitled to vote but they were prosecuted or the focus of a prosecution because there was some name on this list that just wasn't accurate.

**MR. KAO:** So if that individual was not put on notice that that was an invalid vote, then he would never be prosecuted to begin with.

If I may turn to counsel's remarks. The question of what the statutory authority is, whether the Government exceeded its statute authority, whether there was ultra vires, it's clear that the executive under Article II has those powers that are now being conducted again. Under Section 611, the Government has the power to prosecute non citizens voting in Federal elections and then aiding -- aiding and abetting statute is Section 2 --

**THE COURT:** Under Article II?

**MR. KAO:** I'm sorry. Article II for the executive, Your Honor.

**THE COURT:** No, I understand. Then you said 611 which is the --

**MR. KAO:** I'm sorry.

**THE COURT:** -- criminal --

**MR. KAO:** I'm sorry. 18 USC 611, Your Honor.

**THE COURT:** Okay.

**MR. KAO:** But what we're not hearing is what the Government is allowed to do. What the plaintiff's position is that the Government by creating this list and tendering it to the different county and state registrars, that that itself because the list is flawed, that exceeds the scope of the Government's authority and that it's contrary to law and arbitrary and capricious. But that is well within the Government's power to do that as an investigative tool.

There is no list that says the Government may do this, A through F, but may not do other things. So that is just one of the different techniques that the Government uses in this instance to try to enforce this particular criminal statute. So there -- it's just one of the investigative tools the Government has.

So it is not beyond their powers to do that. It is not ultra vires. There is a rule and there is a reason for DHS having worked with the DOJ to create that list to try to enforce this particular statute. And just because the Government has chosen to do that under this administration but perhaps it has not been as visible or as controversial in other administrations does not mean that the Government cannot still use its powers under this particular statute.

**THE COURT:** Now do you agree with counsel that your list was created by artificial intelligence or with the assistance of intelligence?

**MR. KAO:** I have no knowledge of that. I -- and they talk about people who -- third-party analysts. If I'm not mistaken, they also in their declarations they have someone, I believe it's a professor from the University of Delaware who has talked about the validity and challenged the validity of the list. So it's fine if we want, my perspective, if the list gets some sort of review, but, again, this is the entire effort by the Government is to have created this list and to have it basically inspected and studied to determine how much of it is valid. And to those points of identifying illegal voters in that, then they should not be allowed to vote.

So it's perfectly within --

**THE COURT:** What did we do before this list was generated to determine whether somebody was a legitimate or illegitimate voter?

**MR. KAO:** Probably very little. I think that's what the problem is. I don't think we as --

**THE COURT:** But the certification process doesn't remedy that and voter registration doesn't remedy that?

**MR. KAO:** Well, it's interesting because it -- every time I go to vote, Your Honor, I feel like -- I vote every four years -- every two years, and as a matter of fact, I feel that

the guideposts keep changing. Like one time I had to present my driver's license and I had to sign and the last time they didn't check my ID at all. So that is, as I think everybody here would agree, that is a state function to actually administer these elections.

But as far as the Federal Government's ability and authority to enforce Section 611 --

**THE COURT:** In that example, are you saying you physically go to the registrar voters and you've had to first show your ID and then the second time --

**MR. KAO:** At the polls, Your Honor.

**THE COURT:** At the polls.

**MR. KAO:** At the polls, yes.

**THE COURT:** And you didn't have to identify yourself in any capacity?

**MR. KAO:** Not this last time. No, Your Honor. Well, this actually -- it's besides the point but I voted by mail this last time.

**THE COURT:** Oh, thank you. So they knew where you lived. Okay.

**MS. LEONARD:** I hope you weren't on the list.

**MR. KAO:** So, again, I think we go back to the distinction between what is authorized as an investigation on the part of the Government and our position is that everything that has been done thus far is within the Government's power to

do so and that does not amount to intimidation.

I think intimidation is something that from one person it's a subjective term, it depends on the individual, it depends on the circumstances. It is not as clearly defined as investigation. So there are investigatory techniques that --

**THE COURT:** When somebody mentions the FBI or the Government coming to do an investigation, you don't think that that feels like intimidation to --

**MR. KAO:** It depends on the circumstances.

**THE COURT:** -- to regular citizens?

**MR. KAO:** To regular citizens -- to your point, I think that a regular citizen has just as much standing in this case as the election worker.

**THE COURT:** So from your perspective, when I say that, I mean someone who is a civilian as opposed to law enforcement.

**MR. KAO:** Yes, Your Honor. Yes, Your Honor. I agree.

I'm saying that an individual out there who has -- who can vote who hears all of the media, that person has just as much standing which is -- which is not to bring suit in this case as election workers do in this case.

**THE COURT:** All right. You may proceed.

**MR. KAO:** So that is all I'll have to say about the APA, Your Honor. We'll stand on our brief and actually our brief doesn't discuss this issue and this goes back to --

**THE COURT:** It's totally silent. And also I proffered

questions and you chose not to answer those questions.

With regards to the relief that's being requested, you may proceed.

**MR. KAO:** Your Honor, I think at this point, again, it -- this is going to be determined by the Ninth Circuit as far as the injunction itself. We would just request that the Court issue a ruling on the motion to stay. And also if the Court could give an indication of how it would rule on the motion to dissolve, the Government would appreciate that as well.

**THE COURT:** Counsel for the petitioner.

**MS. LEONARD:** Very briefly, Your Honor, just to respond to a few points then I'll turn to the scope of relief and happy to answer any questions Your Honor had.

I just want to clarify because I think counsel is trying to pivot to something to portray this case to be something it's not. This case is not a legal challenge to the creation of the list. This case is not a legal challenge to actions to verify the names on list.

This case is a legal challenge to the use of that list to threaten election workers and intimidate election workers and coerce them if you don't do A, we will do B. And it's evidence. The list and all of its flaws, which are the subject of other litigation and perhaps the creation of the list and the way that that happened could be challenged in other litigation, but it is evidence of their policy and plan of

intimidation and threatening and coercion hear. Because even they know that there is not a valid law enforcement purpose of these coercive tactics because even they know, as counsel admitted here today, you can't be -- you can't be prosecuted for aiding and abetting without -- without knowledge of illegal voting, even they know that.

But what do their letters say? This list gives you actual notice of non citizen voting in bold italics. That's what they did. They sent -- the Department of Justice said you are on notice because of this list, actual notice, bold italics of non citizen voting and every person who processes one of these ballots, we can come for you. That is a threat. That is intimidation. That's coercion.

That's what this case is about. It is not about the lawfulness of the list. The list is evidence, Your Honor, that relates to those --

**THE COURT:** We all agree that the list is flawed.

**MS. LEONARD:** I think I heard a high error rate.

I want to make one correction to the record on behalf of -- the person who is making plans for the absence was actually from San Benito County, not Santa Clara. It's Diaz, 29-5 -- ECF 29-5. Just wanted to make sure we didn't --

**THE COURT:** ECF 25?

**MS. LEONARD:** ECF 29-5 is the declaration.

**THE COURT:** I'm sorry. One moment. I'm trying to

assist my court reporter. 29-5?

**MS. LEONARD:** Yes.

I apologize, Your Honor. I do that in depositions too. I will do my best not to speak over you.

Now moving on to Your Honor's questions regarding scope of relief. I'm happy to answer any of them. I think I would say they -- several of them were aimed at I think questions regarding whether there should be some narrowing with respect to geographic scope or other aspects of the relief. And we've answered your questions in -- I mean, suffice it to say that the threats have been nationwide, the social media amplification has been nationwide, the plan and policy is nationwide, and our clients are nationwide.

And the connection between the clients and the people feeling the harm and the relief that we're seeking is very clear. And to the extent that in any particular state or county where we -- the plaintiff unions represent -- SEIU and AFSCME represent election workers all over this country. And to the extent there are other election workers there that are also intimidated who are not union members or there are voters whose votes are processed not by a union member but by somebody else, the fact that they're protected by Your Honor's order too is an incidental effect of providing complete relief to the plaintiffs, and that is perfectly allowable under the law including the *CASA* decision from the Supreme Court.

Long standing tradition that if it's incidental to the relief, giving complete relief to the plaintiffs is perfectly fine. Also the APA is an exception. 705 allows Your Honor to stay and enjoin on an interim basis action that is unlawful under the APA for purposes of maintaining the status quo and preserving the ability of plaintiffs to get the complete relief at the end of the case.

I'm happy to answer any other questions about scope of relief.

**THE COURT:** If the Court were to consider narrowing the order, what would be your position?

**MS. LEONARD:** On whether the Court has the authority or how? Sorry. Okay.

Yes to -- for all of the reasons previously stated, we think that the Ninth Circuit premature appeal hasn't taken away the Court's authority to do so. We think there are things that could be clarified in the order, understanding the remarkable speed with which Your Honor acted. In particular, I know that the defendants have raised issues about the directive to give the Court notice of certain materials. We've explained why that was included in our submission to Your Honor. The idea that it is -- the Court is authorized to anticipate and ask for information which is all that that is but Your Honor could certainly clarify that that information would be provided in-camera.

**THE COURT:** Under seal.

**MS. LEONARD:** Or not even -- I mean, I think in-camera and not to the plaintiffs would be a clarification that would I think satisfy the issues that the defendants have raised.

**THE COURT:** And would that have to be before me or before the judge of which they're asking for subpoenas and search warrants.

**MS. LEONARD:** I will confess that I am not a criminal lawyer, Your Honor, and I think that there are certainly due process rights of anyone who is the target of such a government action that they will certainly be raising in defense to such a subpoena, and I don't -- I cannot speak to all of what goes on there.

**THE COURT:** Thank you.

Anything further that you would like the Court to take into strong consideration while taking the matter under submission and indicating that this restraining order as it -- the temporary restraining order as it stands will expire November 13th at 5:00 p.m. subject to any modification that may take place today. Anything further that you would like to add?

**MS. LEONARD:** I think on behalf of plaintiffs, Your Honor, I just want to say thank you. We are here for the election workers, we are here for the voters who are being right now injured by the actions of the Federal Government. And if the question is should the motion for stay be denied,

absolutely.

All four factors weigh heavily in favor of the of plaintiffs, merits, harm to the plaintiffs and the members, public interest, absolute -- emphatically weighs in favor of the --

**THE COURT:** And please place in all dimensions the public interest.

**MS. LEONARD:** I think that -- the public interest question I think it merges when you're dealing with the balance of the equities, it -- when you're dealing with unlawful action by the Government -- unconstitutional action by the Government, which we believe we have shown. It is of our -- the highest in public interest to ensure that our election workers are protected, our voters are protected from excess of Federal authority. That is -- that has to be of the highest public interest in this country.

And as against that, the fourth factor, Your Honor, harm to the Government, there is none. The only thing they've identified in their papers is this amorphous claim that somehow Your Honor's TRO is interfering with legitimate law enforcement activity. It's not.

Your Honor was targeted at the specific acts or threats, coercion, intimidation, those letters -- this is not legitimate law enforcement activity. The prosecutions of individuals should this administration choose to do that,

that's a separate thing.

This is not just law enforcement verification of the right to vote. This is something completely other and it is unprecedented I believe in the history of this country.

**THE COURT:** I hope you find another word other than unprecedented.

Is there any -- do you want a moment to consult with other members of your team to see if there are any other last words while -- before surrendering the podium?

**MS. LEONARD:** I would. Thank you.

**MR. KAO:** May I do the same, Your Honor?

**THE COURT:** Yes.

**MR. KAO:** Thank you.

**THE COURT:** If you'd like, we can take a 15 minute break.

**MS. LEONARD:** I think, Your Honor, if there were to be a modification to the order and I think Your Honor were to clarify to make clear what I think is quite implicit in the order that it is not intended to interfere with bona fide and legitimate law enforcement activity, I think that would be perfectly appropriate.

**THE COURT:** Thank you.

Counsel.

**MR. KAO:** Your Honor, just one last point, if the Court were to narrow the scope of the order and without

conceding our argument on jurisdiction, we would ask that the geographic area be limited to the Northern District of California. That overlaps with the Court's order in the *California* case, which incidentally is also now being brought by writ of certiorari to the Supreme Court. I'm not sure if the Court is aware of that. But that's being elevated to the Supreme Court.

Other than that, I want to thank you for your time and the Government's interest in -- in trying to have a fair and free election as well, Your Honor.

**MS. LEONARD:** Just I think it would be inappropriate to limit it the Northern District of California given the scope and scale of the plan and actions by the Federal Government and the plaintiffs in front of this court.

**THE COURT:** Thank you.

All right. The matter is taken under submission.

All parties agree that the Court can modify the expiration given the procedural history of this case. Any other modifications should they arrive will be seen by close of the business day.

And then the order, although the Court may notify you in the event the Court determines that modifications are appropriate and the extent to which they're appropriate, the written order may take a little longer because, as you know, everyone was filing an hour before and the Court read those,

but this is a case where time is no longer necessarily of the essence. I think everybody now agrees that this isn't an emergency for the Government to get this underway, and so as such, the Court wants to take its time in generating the written order.

**MR. KAO:** Very well, Your Honor. Thank you.

**MS. LEONARD:** Thank you, Your Honor.

**COURTROOM DEPUTY:** That concludes the calendar and court is now adjourned.

(Proceedings adjourned at 12:48 p.m.)

---o0o---